Good morning, and may it please the court. This morning's argument addresses three issues founded on the Outer Continental Shelf Lands Act, fundamentally You are Ms. Harris? Yes, Your Honor. My apologies. And I would like at this point to reserve ten minutes for rebuttal. Okay. Just keep your eye on the clock. Thank you, Your Honor. This morning's case addresses fundamental requirements under the Outer Continental Shelf Lands Act, requirements for offshore oil spill response and prevention. These issues strike at the heart of an oil company's ability to stop and control an oil spill in the Outer Continental Shelf. The court's resolution of these issues, however, will be founded in nothing more than the hallmark principles of administrative law, and most notably that it is the agency's obligation to provide an explanation for its actions in the administrative record, to have provided a rational explanation between the conclusions it's reached and the facts before it. Could I just ask you as a preliminary matter, you didn't challenge in the Chukchi Sea briefs, you didn't challenge the, as a violation, the compliance with 550.219A, the approval of the OSRP. And opposing counsel argues that that issue is moot. Are you still arguing that with respect to the Beaufort Sea petition, or have you dropped that claim? Your Honor, we are still pursuing that claim. That's the argument under 550.219 is not moot in the Beaufort for several reasons. First, the agency in this case has taken no steps to moot the claim. They have not gone back and reevaluated its decision or taken any steps that would moot the unlawfulness of the agency's action here. And ultimately, the Petitioners can still obtain meaningful relief both through vacature as well as this Court's articulation that this was unlawful behavior. As evidenced by the fact the agency is continuing to engage in this pattern of behavior right here in the Chukchi is a perfect illustration, absent a ruling from this Court that this is unlawful behavior, the activity will continue. So, yes, we are pursuing the claim in the Beaufort. So the argument that the agency shouldn't have approved the exploration plan when the approval of the OSRP was pending, even though the OSRP is still – is now approved, your argument is that in the future they shouldn't approve it or that it was an error in the past? Can you just help me understand? Certainly, Your Honor. It was unlawful at the time the agency made the action for a couple of reasons. But let me be clear. The spill plan that you have before you is not the spill plan the agency – the sister agency ultimately prepared and approved. There are three spill plans. That third spill plan is unlike anything you have sitting before you. It has changed its oil spill trajectories. It has increased the equipment. It has changed response. It is using new techniques. It is not the plan that you have before you. More importantly, it is not the plan the agency had before it when it was reviewing and considering the exploration plan. If I may, perhaps I'll turn to well capping. The first two – let me return to the first two issues, and they address both the Chukchi and the Beaufort Seas. Here, well capping has been approved for the very first time in the Arctic Ocean without the agency reconciling or explaining its conclusion to accept this proposal, despite years of Shell explaining it would not work. Shell has maintained consistently that this technology is not safe to use in the Arctic, that it is not feasible because of the Arctic conditions and the Arctic – the uniqueness of the Arctic drilling operations. The second issue I will address reflects the maximum duration blowout here that the agency approved, accepting the proposal that Shell believes it will be able to drill an emergency relief well faster than it can drill a normal well, despite the fact there is no evidence before this Court that that has ever happened in the history of the country or even the world. And the evidence in the record – Isn't that just a disagreement with the agency's conclusion? I mean, the agency is expert in this. We are required to defer to its expertise. The fact that something hasn't been done before doesn't mean the agency can't rationally come to the conclusion that it will happen this time. Absolutely, Your Honor. If that's what the agency had done, we'd be in a very different situation. The agency has not analyzed the issue and applied its expertise to this issue and reached a conclusion. Here, the agency was silent. There is no explanation offered in this record that Your Honors could point to and then ultimately defer to. Well, they didn't expressly give a reason as to – there was a difference between what Shell had said, I take it, in an earlier exploration plan than this one. And the agency didn't say, notwithstanding the fact that they said something different, we now approve it. But they did approve. They did express their reasons for approving the plan and the exploration plan that was before them, didn't they? They did, Your Honor. But let me clarify two points. First, you are correct in pointing out that Shell's estimates today differ from Shell's estimates for these very same wells last time. In the Beaufort, it's by almost two weeks. That's an unexplained difference. Here, the agency, though, is obligated to have explained the reason why it believes this constitutes maximum duration. The regulation imposes that obligation on this agency. And when they promulgated the regulation, the agency added the descriptor maximum. And the explanations being provided essentially are we might be able to intercept the well. A relief well is a directional well that intercepts the original well. We might be able to hit that at a more shallow depth. It will be an emergency, so we'll be able to operate more quickly. Ultimately, it's perhaps most reflective of the fact that Shell is banking on the fact it won't have to drill a mudline cellar. In the Arctic Ocean, unlike other drilling operations, you do not simply set a blowout preventer on the ocean floor. Ice will gouge along, including at these specific drill sites, gouge the ocean floor and potentially rip that blowout preventer off. The company must construct a mudline cellar that's roughly 40 to 45 feet deep into the ocean floor. The agency, in its conditional approval, said you might have to build that mudline cellar for a relief well. That time should have been at a minimum included in those estimates, and it wasn't. Here, the agency hasn't explained its conclusion why this constituted maximum. Let me return to well capping ever so briefly. Again, this is a technology that Shell has rejected consistently, both in its drilling plans and in its spill plans. It has not explained how it's grappled with any of the problems, problems that are unique to the Arctic. This is not something that has changed since Deepwater Horizon. There's no requirement, right? I was just puzzling through this argument. There's no requirement in the regulations that the agency expressly make some statement about why they're accepting a plan, the plan in front of them, when the applicant said something different in a prior plan. Is it your theory that that's irrational, or why is there a problem with what the agency did? This court has explained in Humane Society, the agency cannot avoid its duty to confront inconsistencies that are presented to it during a comment process simply by blinding itself to them. The capping system has been at the heart of this controversy. The agency has received strong criticism, both from public, from governmental agencies, from the State of Alaska, questioning Shell's readiness to use and deploy this technology, in part because of Shell's reversal, in part because Shell hasn't explained how it's going to confront the anchoring problems, the buoyancy problems, the mudline cellar. These were all Shell's explanations why this won't work in the Arctic, unlike the Gulf of Mexico. This technology has been around for decades. I point you to Beaufort record, excerpt of record at 544. This has been used since the Iraq-Kuwaiti conflict in the 1990s all over the world. Shell has said, though, it won't work in the Arctic, it's not safe in the Arctic, and hasn't explained to the agency or to this court how it's addressed any of those problems, the problems with mooring a floating vessel, a mudline cellar, the ice. Again, this is all unique to the Arctic, and this isn't the petitioner's argument. This is the company saying, here's why this won't work, and there's nothing in this record that explains Shell has grappled with that problem. Opposing counsel also makes the argument that this was not required to comply with the oil spill regulations. It's sort of an icing on the cake type argument. Why is that wrong? Yes, Your Honor. The icing on the cake here is what Shell is describing as its fundamental aspect of spill prevention. This is required, to be clear. Sub-2.11 requires pollution prevention measures to be included in the exploration plan. But they had an approval of their 2010 plan, and this is an addition. Isn't that right? This is correct. None of this is explained in the approved spill plan. But that didn't – there wasn't anything in the 2010 plan. Any regulatory – was there a regulatory change? I know that there was the NTLs, but that seemed to go to the BSEE's approval, not to the OEM. There was no regulatory approval, but there are regulations that require this. The new and unusual technology requirement requires the company to explain equipment that has not been used in this environment, not been used under these operating conditions. Well, that's a description and discussion, right, of the new technology? And they argue that the information they provided fulfills description and discussion. There's nothing in the regulations that explains exactly what that means. The unlawfulness here is the agency's failure to reconcile and fulfill its obligation to address conflicting evidence. The requirement is embedded in these regulations, both in the BAS, the best available and safest technology requirements housed at 107, at the 213D under the new and unusual technology, and ultimately the worst case discharge scenario also includes the requirements for spill plan prevention equipment. But the unlawfulness, Your Honor, is that the agency has not explained why it's accepting this, and more importantly that Shell has grappled with any of the problems that it identified. So what has changed post-Deepwater Horizon in the Arctic, Your Honor? Nothing. But wait a minute. Shell has explained why they now believe the capping can work by citing the Kuwait and Macondo incidents. What you're saying is that those incidents occurred under non-Arctic conditions and therefore should not be evidence which the agency should consider. But you're treading, aren't you, on the agency's expertise? Shouldn't they be able to determine that that evidence is sufficient so long as the evidence is there? If the agency had done that, Your Honor, yes. But that's not what they did here. Their approval indicates that they had this information and their actions are what we're reviewing. We're not trying to read their minds. Exactly. That's the problem. As this Court has made clear, you must find the reasoning, the agency's reasoning for its decision. The ultimate conclusion is not itself sufficient. In Arlington, the Court has explained, you are limited to considering the explanation the agency has provided. You can't provide that reasoning and you can't infer it from silence. That's at Arlington 1-1. But I thought that as long as we had two versions before the agency and the agency chose one, our role was over. Not to have enacted in a non-arbitrary fashion. The agency must confront conflicting evidence, apply its expertise, and explain its conclusions. And if the agency had done that in this case, we'd be in a very different situation. But there's nothing in this evidence before you that the Court has – that the agency might have used. And your best case for saying that the agency has to articulate in writing that they have confronted conflicting evidence and have chosen certain evidence over others in that detailed form is? To be – well, I'll give you three. Arlington Center for Biological Diversity, that's at 538 F3rd 1172. Pacific Coast Federation versus Bureau of Rec, 426 F3rd at 1002. But to be clear, Your Honor, we're not arguing about details here. We're arguing about the fundamental approach. Details can come later. Here the agency hasn't grappled with fundamental elements of is this safe? Are you going to sink the drill rig, as Shell has said? Well, what the agency hasn't done is to say Shell has spoken out of both sides of its mouth, and we take the later explanation and not the former. Essentially. Why have you now – why has Shell demonstrated? Isn't our scope of review limited to whether the agency has taken – has related the two positions and chosen one? Not why they've chosen it or how they got to choosing it, but that they've seen the evidence and chosen one. This Court's precedent has consistently held there is an explanation that must be provided. When you have conflicting evidence, and here it is the company saying in an Arctic environment, when you have to anchor a floating vessel to the ocean floor, you cannot deploy this capping stack safely. You are compromising the integrity of that vessel and the safety of that crew by doing so. There's nothing in this record the agency has before it to explain how Shell has fixed that, how Shell has fixed the problems of deploying a capping stack onto a blowout preventer in a mudline cellar. Shell hasn't explained how it now has that technology. None of that came from Deepwater Horizon, Your Honors. Those were different facts, different situation, different type of capping stack that didn't confront any of the problems of the Arctic. And with that, I will reserve the remainder of my time. Okay. Thank you. May it please the Court, I am David Shilton, representing the Secretary of the Interior and the Bureau of Ocean Energy Management. I will be sharing half my time with Intervenor Shell and just note that Rebecca Cruz from the State of Alaska is also here but will not be presenting argument today. I want to start by just making a couple of points about the Outer Continental Shelf Lands Act that I think are very pertinent to today's controversy. The first is that the Act at 43 U.S.C., Section 1340 C.1, says that the Secretary of Interior shall approve an exploration plan within 30 days of its submission if the plan is consistent with the statute, with the regulations under the statute, with the lease provisions, unless the proposed activity under the plan would probably cause serious harm to life or property, national security or defense, or the marine, coastal, or human environment. Now, the petitioners here do not make a claim that the activity that's included in Shell's exploration plan would cause such serious harm. They simply focus on compliance with the regulations. And they say that there was not enough detail in the exploration plan to meet the agency's requirements about what ought to be in an exploration plan. But as to that question, there's another very pertinent provision of the statute, which is Section 1340 C.3. And that makes clear that the Secretary of Interior is authorized to determine by regulation the degree of detail that an exploration plan must contain. So Congress has delegated to the Secretary the discretion to determine how much detail must be in an exploration plan. And so those regulations with respect to some aspects of exploration plans require considerable amount of detail. But with respect to the lessee's plans for oil spill response, that requires only general information with regard to plans for responding to an oil spill. And that makes sense because it's consistent with the nature of the exploration plan process and where it fits into the whole scheme of approvals. The exploration plan process is where the Bureau of Ocean Energy Management determines that a plan generally is adequate for safely conducting the contemplated activities, but it's not where particular oil spill response plans or particular technologies like camping stacks are actually given approval. That's done at a different stage, carried out now by the Bureau of Safety and Environmental Enforcement, which reviews the oil spill response plan itself, and in this case has now approved both of the oil spill response plans. And it's reviewed again when the company applies for an application for a well permit. And that is right before the company starts operations, that they have to have their well permit. And those... I'm sorry, just to make sure I understand. So in order to get a well permit, you can't actually start drilling until you get a well permit? Correct. And what's required to have in place? You have to have an oil spill recovery plan or prevention plan before you get a permit? Correct. Although it is possible to actually start operations without an approved oil spill response plan if you make a certification to the agency that you have the capability to respond to a worst case discharge. But in this case, that's rather moot because Shell has both of its oil spill response plans have been approved. But it does need to get approvals for its well permits. And at that stage, the Bureau of Safety and Environmental Enforcement looks closely at the particular technology like well capping. And as the Bureau of Ocean Energy Management made clear in its approval here, Shell is going to have to make a substantial demonstration before it gets its well permit that its well capping plan is adequate, that it's well designed, it can be deployed. They'll have to make a demonstration that they're able to deploy it. I thought that's already been done before the BSEE. The oil spill response plan has been approved. But the permits to drill have not been approved. So there is that remaining step. Are there any additional requirements after the BSEE approves the oil spill response plan that change the oil spill response plan before the permit to drill is issued? It's possible that the agency could require additional revisions to an oil spill response plan. It can do that at any time. Do you agree with Ms. Harris that the oil spill response plan does not require a mudline coffer or digging? It's not required. It will depend on the circumstances. Could that be required as a requirement for the drill permit? Well, that will be up to the Bureau of Safety and Environmental Enforcement. But where we are now is that the agency has said a mudline cellar for drilling a relief well will depend on the circumstances at the time. There will be a mudline cellar for the exploratory well itself. That is required, yes. But I think the petitioners have raised two different concerns with regard to the mudline cellars. One is, did we have a good estimate of the time for drilling a relief well, where Shell's estimate assumed that they would not have to drill a mudline cellar for the relief well? That was a good estimate because, in all probability, they would not do a mudline cellar for the relief well because you're doing it on an emergency basis. But there is a mudline cellar for the exploratory well itself. So they've raised the question, well, will the capping stack work when you have a mudline cellar? And the agency basically looked at the experience in the Gulf of Mexico with regard to the Macondo and so forth. And Shell offered to do this well capping stack as an additional measure, and they think it will work. How do you meet the criticism that the conditions in the Gulf of Mexico and the conditions in the Gulf of, I guess, Persia, are quite different because there's not much ice in either the Gulf of Mexico or the Gulf of Persia to scrape along the bottom and knock the capping system askew? Conditions in the Gulf and in the Arctic are different, but in many ways conditions, say, at the Macondo well where this was successfully used, are more difficult in that that well was over 5,000 feet. These wells are 150 feet. So, you know, in some ways it's going to be easier. It could be more difficult if there were deep ice, but the ice comes in, of course, around November 1st. Is there any evidence at all in the record that the agency considered the problems of ice scraping the bottom at the 150-foot level in the Beaufort Sea as a reason that the capping system would not work? Not specifically, Your Honor, but this is not where that sort of determination is made. That determination as to whether the capping system is designed to meet all contingencies is made when the well permit is approved or in approving the oil spill response plan. This is simply the general plan approval stage. Does Shell have a plan that's safe and doesn't threaten the marine environment? Is it part of your argument that any attack on the feasibility of the oil cap system should be directed to a district court under the OPA? It would be more appropriate if brought in district court. Right. So the statute does require the agency to make a no-harm determination. That's the statutory requirement.  No harm to serious harm or damage to life. And so where you're deferring those decisions to the BSEE, so that was the argument of opposing counsel on the conditional approval. Did the agency make the no-harm determination and then also put on conditions, including waiting for approvals from other agencies, including BSEE? Or is the no-harm determination contingent on what these other agencies are doing? Well, the agency's approval of this exploration plan basically says that this was not a situation where Shell's plans would probably cause that serious harm. That is done at the exploration plan stage. But it does appropriately impose a bunch of conditions on Shell, recognizing that there are all these other approvals that Shell has to make. And Bureau of Ocean Energy Management keeps track of that approval process. It doesn't wash its hands of this whole project at this point. It keeps an eye on that. But again, the actual particular determinations about technology now shift to the Bureau of Safety and Environmental Enforcement, which is in charge of these more technical questions. And they'll take a hard look at Shell's technology at the time of approving the well permits. But I think what really governs here is what do the regulations require to be in an exploration plan? And they are quite general. They simply require a description of the technology that Shell plans to use to respond to an oil spill. So based on the information that was before the agency, so the determination of the agency was it fulfilled the informational requirements of the regulations, and the agency could make that statutory determination, I think it's also in the regulations, that it probably would not cause harm. Is that correct? And then the conditions were, in addition, they continued their monitoring. Is that how you understand what the agency did? Yes, that sounds correct. It does make this determination at that time, but in recognition that there are more steps that other agencies will be taking, and it itself will keep a close eye on the situation. And that's really what Congress had in mind at this exploration plan approval stage. I mean, keep in mind that the agency only has 30 days from complete submission to make this determination. So, again, that indicates that this is a general sort of look at Shell's plan to make sure that it does have a sensible, safe plan, but particular determinations get made elsewhere. And it's the same way with the relief well issue. I mean, there, all of the regulations require is an estimate of the time for drilling a relief well. Well, the exploration plans certainly had estimates, and Shell provided the reasons for why it came up with its estimates. It said it would drill in an expeditious manner much more quickly than it would when it's drilling an exploration well, when it's testing all the way along to see if there are hydrocarbon resources there. And so the agency could reasonably take that estimate. So, again, Congress has given DOEM the discretion to determine how much detail it needs in an exploration plan, and its regulations indicate that on the particular topics that petitioners have raised here, that the agency needs only general information at this particular stage. Now, just quickly with respect to the argument about the oil spill response plan being approved, and this is only raised in the Beaufort Sea case, what had happened was there was an approved oil spill response plan approved in March of 2010. Shell had submitted revisions to that because the agency, after Deepwater Horizon, said you need to revise your plans in certain ways to increase your worst-case discharge. So they had submitted those revisions. But in the agency's view, that does not revoke the approval. There is still an approved oil spill response plan. And so the requirement in the exploration plan regulations for referring to an approved oil spill response plan were complied with because there was this approved plan, and it's perfectly consistent with that for the agency to actually look to those revisions. And those have now been approved. There were some slight changes in the approval of the oil spill response plan, but it is basically the revised plan that was before BOEM when it approved the exploration plan. Unless there are other questions, I think I've used my time. Thank you. Kathleen Sullivan. Good morning, Your Honors. Kathleen Sullivan for Respondent Intervenor, Shell Offshore. I'd like to begin with the oil spill response plan where my able colleague from the government left off. We were surprised, Judge Akuta, to hear the petitioners not say that their Camden Bay objections on the reference to an approved oil spill plan were moot by the March 28th approval of the new revised Camden Bay oil spill plan. I was surprised to hear that they didn't moot it out because, as you observed, they don't raise it for Chukchi. But even if we have to satisfy that requirement and it's not moot, we amply did so, the government correctly observes that there was an approved spill plan in place at the time of the approval of the exploration plan. It was the 2010 spill plan. The 2010 spill plan was approved. I just want to add to that that the 2010 spill plan provided for a response capacity sufficient to deal with the worst-case discharge. So in other words, if petitioners are right that the agency had to compare the old spill plan response capacity to the worst-case discharge, it was adequate. And if I could just refer, Your Honor, to the pages where you can see that. The worst-case discharge that the 2010 spill plan adequately addressed is on excerpts of record page 228. It says the worst-case discharge on day one would be 9,468 barrels a day. But even before we get to the new oil spill plan, which petitioners is right, has much more increased capacity, the 2010 spill plan already could handle 9,468 barrels a day because on SER page 236, you'll see a chart, and in the chart it says that the response capacity in the 2010 spill plan is 9,600 barrels a day. So there is no substantive problem with the 2010 spill plan, which was approved at the time of the exploration plan approval. Ms. Sullivan, I'm a little puzzled by the position that Ms. Harris took, that this issue has not been mooted by the March 28, 2012 approval by BSEE of the revised spill plan because if I follow her position, this is a reason why we should reverse and remand to BOEM. And I'm puzzled what is BOEM to do now if we do remand but to approve again because now they've got an approved spill plan. We agree, Judge Beyer, that there would be no point in a remand to now reapprove a plan that was already properly approved because it did refer to an approved spill plan because there's now another approved spill plan which provides additional capacity. It would be a futile waste of resources. I think Ms. Harris will address that when she – And of course the Outer Continental Lands Shelf Act calls for expedition. The reason we're here before you in the court of appeals is that there's a call for expedition here. There's a 30-day approval requirement under the OCSLA, and it would be futile and wasteful of time to send it back to reapprove based on a new spill plan, a plan that was already adequate at the time. So we think it's moved. We also would remind the court that, of course, the substantive adequacy of the spill plan doesn't come to this court. It goes from the BSEE to the district court. So the substantive adequacy of the spill plan cannot be before you. All that's before you is whether there was a reference to an approved spill plan, and there was, the 2010 spill plan. If I could turn next to the capping and containment system, I'd like to start by just putting this in context. Judge Icuda, you are absolutely right to say that the capping and containment system that is adequately described in the revised 2012 exploration plan, it's adequately described at multiple paragraphs, and you can find those in the record at ER 237. The capping and containment system is, Judge Icuda, icing on the cake. In other words, the approval of the exploration plan with respect to an oil spill response capacity was already adequate before the conditions pertaining to the capping and containment stack were added. The approval letter, though, that BLEM wrote seemed to, and their comments, response to comments, seemed to rely heavily on the existence of the well capping plan. It was hard to say that it wasn't taken into account in their approval. They mentioned Shell has committed to having a subsea well capping and containment system, and that was part of their approval letter. That's right, Your Honor. In paragraph 9 of both approval letters, paragraph 9 as to Camden Bay and paragraph 9 as to Chukchi, there's reference to the capping and containment system. But the key point I want to make is that's icing on the cake. The approval would have been proper even without the conditions, without any of the conditions. Some of the conditions refer, as Chief Judge Kaczynski referenced earlier, some of the conditions refer to other permit requirements that need to be satisfied in this multiple permitting process. Paragraph 9 refers to these conditions that Shell put voluntarily in its new plan, to use a capping system, a capping stack that can go down into the wellbore and close off a spill. And as Judge Bay observed, the key change that led Shell to think that could be successful was it did succeed in Macondo. After many other things had failed in Macondo to stop the blowout at the deepwater horizon, it was the capping system that succeeded. And Shell should be encouraged, not discouraged, from changing its views of technology over time when it has seen that new technologies work. But the key point, Judge Akuta, is that there were already many reasons to approve the plan before you get to capping and containment. Remember, the oil spill response includes the ability to fill the well with mud, the ability for shears to cut off the flow of oil down below the seafloor. If there's a well control incident. The exploration plan then, as you come up from the bottom of the floor, also involves the relief well that's in the plan. And then it involves on the surface, if oil does flow up on the surface. It seems to me, Ms. Sullivan, that the experience in the Gulf of Persia and the Gulf of Mexico, warm water places both, don't deal with the specific reason that Shell gave for not using well capping in the Arctic in their 2010 plan, which was ice would scrape along the top of this very shallow reach and knock off and damage the well capping system. I mean, the learning by Shell of the warm water explorations don't seem to have any relevance to the Arctic. Well, Your Honor, we're now at the heart of what you should defer to, which is the agency's technical and scientific expertise. Lands Council versus McNair, Center for Biological Diversity. It's precisely in a technical assessment, like whether ice would shear off the capping system if deployed, that we should defer to the agency's decision that it was approving the system. But I would just like to point out that the capping- Where they entirely fail to consider one important aspect of the problem. I'm quoting now from the National Association of Home Builders. Isn't this a situation where they've entirely failed to consider one important aspect of the problem, which is there's ice in the Arctic and there isn't in the Gulf of Mexico and there isn't in the Gulf of Persia. Respectfully, we do not think that was a failure to consider. What they were obligated to consider is whether Shell provided in its exploration plan an adequate description of its methods for responding to an oil spill. And our key point here is it Shell satisfied that requirement before you get to capping and containment. Capping and containment are the icing on the cake. The conditional approval adds in condition number nine an additional kind of supererogatory above and beyond system that Shell is now offering to provide. But the other systems, closing off the flow underwater with mud or with shears, using a relief well, or using containment on the surface through the use of skimmers, booms, containment mechanisms designed to take the oil off the surface, you could have approved the exploration plan without capping and containment at all. The problem I have with that argument is, again, we're not reading the mind of the agency. It approved something in 2010. Then it had this deep horizon, this Macondo blowout. And there's new NTLs issued that relate to BSEE and concern about well capping and containment. And then the next thing we see is an approval letter from the agency seeming to require this as part of the approval. So I don't know how we can say, well, merely because they approved the 2010 plan without it, they're now saying this is not a necessary part of our approval today after these events occurred in the Gulf. There's nothing ‑‑ I didn't see anything in the approval letters or the comments suggesting that this was not required as part of their determination that there wasn't probably going to be harm. How do I deal with that? Judge Aikuda, even if you think you need to address the adequacy of the agency's view of the capping stack, the requirement here under 43 U.S.C. 1349C6 is that the Bureau of Ocean Energy Management finding must be deferred to by you if it is supported by substantial evidence on the record considered as a whole. It shall be conclusive if there's substantial evidence in the record as a whole. And there's substantial evidence in the record as a whole that these multiple measures to stop the flow below the surface with shears and mud, to drill a relief well, to kill any kind of well control incident, and to contain oil on the surface plus the capping stack considered together provide an adequate response. And this is where the deference to the agency should be at its apogee, because it's in the realm of scientific and technical expertise. Moreover, petitioners haven't suggested any reason, Judge Bea, why the Arctic is really different. ICE will not shear off the capping stack in any way that is problematic for the well, because the point of the capping stack is it goes down, it sits on top of the faulty blowout preventer, and by the way, Shell also has a blowout preventer that it thinks will stop the discharge at the outset. And once the well is killed, and if a relief well is then used to pump mud in to kill it, the well is dead. So the idea that ICE would come along and shear off the capping stack at a later point is irrelevant. The point of all of these measures is to kill any sort of, quote, blowout. So the idea that ICE is going to come along is so speculative in relation to what is really going on here, which is a set of combined measures to kill the well. That's not the reason that Shell gave for not using well capping in the past? Well, yes, Shell evolved in its view, and we think that you should interpret these statutes and regulations to encourage companies to evolve in their views of technology, and the key teaching came from Macondo. It came from the fact that after the many desperate measures that the government and BP engaged in to try to kill that well, which was in very different circumstances, mostly because of water depth, not because of ICE, but because of the much deeper production well involved as opposed to a shallow exploration well, Shell should be encouraged to learn from those measures to come up with more icing on the cake when it already had a very good cake. But we think you should defer, and there's substantial evidence in the record as a whole. And we don't think there's any obligation on the agency's part to have compared Shell's prior and subsequent decisions. Just on that point, Petitioner said, oh, there's an inconsistent position here, and the agency was obliged to reconcile it under the Locke decision. That's not so. Locke concerned inconsistencies in the agency's own position on the danger that certain predation posed to salmon, fish. They said it didn't pose a danger once. The agency said it did pose a danger later. The agency is obligated under Locke to reconcile its own inconsistent positions, but if there is no case that says the agency must reconcile a company's supposedly inconsistent positions, in Judge Acudo, we don't think they're inconsistent. We think Macondo encouraged a teaching about capping stacks that Shell properly relied on, and we should encourage, not discourage. We shouldn't engage in no good deed goes unpunished. They've added a new technology that worked. It's icing on the cake. There was adequate statement in the exploration plan of what the oil spill response was comprised of. But last, the substantive adequacy of the oil response plan is not before you. As Mr. Shelton so ably described, this is a blueprint. The exploration plan is the blueprint. Chief Kozinski asked, aren't there other permits later? Yes, just like in a house you have a blueprint and later you have your plumbing permit and your electricity permit, so you have to get the application for a permit to drill, which has the specs for the drilling. You have to get the air permits, the permits about harassment of wildlife. And finally, you have to get the approved oil spill plan, which has now been approved. Any substantive challenge to that goes to the district court from the BSEE, not to this court from the Bureau of Ocean and Energy Management. And finally, if no more questions on capping stacks, if I could just turn to the relief well issue. Here, too, we think deference to the agency should be at its apogee because this is an area within its technical and scientific expertise. And remember the relief well idea, this is if nothing else has worked yet. You've tried to pump mud down the drill chute. You've tried to shear the drill chute so that it closes in on itself way underwater and under the mud cellar line. You try to contain the oil if it comes to the surface. The relief well is a measure you use to come in from the side and try to come at the drill bore above the level where it's pulling minerals out of the ground, come in at an angle, and then pump mud in to kill the well. And the agency was entitled to find substantial evidence in the record that drilling a relief well will, as Shell said, take far less time than drilling an exploration well. It's true we said drilling the exploration well, which is like building a skyscraper under the sea, that takes a lot of time because you're trying to drill so as to analyze and collect data, which is very time-consuming. You're trying to drill straight down. It's part of a very orderly process. A relief well is done under emergency conditions, and it has one purpose, get the relief well to the exploration well pipe so that you can pump mud in and kill the well. It can be done in an emergency fashion on a much faster basis. And there were numerous bases in the record for the agency to conclude that the estimate and all that there needs to be as an estimate was adequate. The maximum duration language is not a worst-case discharge language. Maximum duration in the estimate, when the regulations want to talk about worst-case discharge, the government knows how to do it. Maximum duration just says give an estimate of the maximum duration of the time to drill the relief well. The agency was entitled to defer. The agency was entitled to rely on that substantial evidence, and we respectfully submit that as to all three of these issues, the reference to an approved spill plan, the adequacy of the capping and containment system, and the adequacy of the estimate of time to drill a relief well, we respectfully submit you should defer to the agency and deny the petition. Thank you. Thank you. What would you have us do if we reverse and remand to tell the agency what to do with respect of the plan which was approved March 28, 2012? Wouldn't they just take it and rubber stamp it and say we already approved this? Well, to be clear here, Your Honor, this agency hasn't seen that spill plan, and respectfully, there are differences. One of the most important, Your Honor, are the changes in the oil spill trajectory. BUM has not addressed the changes in Shell's purported plan. Pardon me. Let's get our facts straight. The revised oil spill plan, which includes the well capping, was approved by BSEE on March 28, 2012. Isn't that what's before us? No, Your Honor. That's a different plan. Shell has three plans. It has its old approved plan. It has the new, the revised, the unapproved that they submitted with their drilling plan that the agency reviewed when it considered its drilling plan. And is now approved. No. There's a whole different plan that has new equipment, new oil spill trajectories that are different from what this agency reviewed, including in the trajectories it analyzed during its environmental review. So what you're saying to me is that the March 28, 2012 approval is of a plan which no longer exists? It is a brand new plan that isn't before this Court and wasn't before the agency. There are actually three plans, Your Honor. That's exactly why this regulation makes sense. Have the approved spill plan first, and then understand that you have a drilling plan that's consistent with that approved plan. So which plans are approved? We now know that the March 2010 plan was approved. That's the two-element plan without the well capping, right? Are we agreeing on that? There is. That third plan has been approved. And then there was a proposed plan, which was set out in the environmental plan, which was to be approved by BSEE, the newly excised bureau within the Department of Interior after Macondo. You're saying that plan was never approved. It's only a third plan, which was approved March 28, 2012. My question to you is how does a third plan differ from a second plan? Absolutely, Your Honor. Three ways that are most important to this agency's determinations. The oil spill trajectories, the anticipated trajectories are different. Where Shell now believes the oil spill will travel is different in fundamental ways than what it was in the record before you and what was before this agency. The equipment is different. The fleet has gotten bigger. There are more impacts from vessels. There is a new modular containment system, which apparently is still in dry dock. This agency has never seen that. It has some sort of an umbilical system. This agency hasn't seen any of that or considered any of those impacts. So they argue that they met the information requirements in that they referenced the approved 2010 OSRP. Do you disagree with that? Absolutely, Your Honor. And let me tell you three reasons. The regulations make clear that there must be a comparison between the approved regional spill plan and the worst-case discharge scenario that is contemplated by the drilling activities. It's noteworthy that Shell chose to ignore this regulation completely. I point you to Beaufort briefing from Shell at pages 21 to 25. Shell omits that discussion in its entirety. That comparison, Your Honor, makes sense here. What this agency wanted to do, as is evidenced by its regulatory history, is have a check. Do you have an approved plan? Does it cover a spill big enough to address the size of a spill contemplated by your drilling activities? In this case, the approved plan contemplates a spill 70 percent greater or, pardon me, smaller than the drilling activities. So in oral argument, they refer us to a chart which compares those two and says it's essentially covering the same size. Your Honor, I encourage you to look at that. What counsel didn't tell you is that on the 14 other aspects of that chart, they aren't arguing they're sufficient. She's pointed to cherry-pick one piece of it. But ultimately, that plan was approved to address a worst-case discharge of 165,000 barrels. Shell's spill contemplated now under the drilling plan is roughly 70 percent greater than what that plan was approved to address. Let me follow up with two quick things, and I just want to do it very briefly here. As to this interpretation question on the approved spill plan, there should be no doubt here that there is no deference owed on the agency's interpretation of 552.19, this question of an approved spill plan. This regulation is quite clear in its use of approved regional spill response plan. And when that regulation is unambiguous, this Court does not apply deference. I point you to the Christensen case and Casarias-Castellon. So in this instance, the agency did so, and promulgating this reg with specific intent to ensure that it had a check on whether the drilling operations would be covered by this approved plan. Again, the interpretation is being advanced essentially that so long as there is an approved plan, it doesn't really matter what it says. It doesn't matter that it doesn't contemplate an oil spill cleanup of a sufficient size, simply run contrary to the agency's entire history at the time of promulgation. Which language are you looking at? As to the first point, on an unambiguous regulation, I point you to Christensen. No, no. Which language in the regulations do you claim is unambiguous? My apologies, Your Honor. I think the most helpful here is A2 sub 4. That's IV. Compare the appropriate worst-case-discharge scenario in your approved regional OSRP. That's a spill plan, the regional spill plan. With the worst-case-discharge scenario that could result from your proposed exploration activities. Curiously, when Shell conducts that ‒ So this is 550-219? Correct, Your Honor. 30 CFR 550-219 at A2. And it includes a number of subparts. I don't know where you started reading, but I didn't follow. At A2 ‒ You started with A2?  Here, there's a regional spill plan, Your Honor, not a facility-specific plan. There are two different types of spill plans. The regional spill plan requires the exploration plan to compare the discharge ‒ the worst-case-discharge that could be contemplated by the drilling with what is in the approved plan. What Shell has done here is rely on the ‒ I asked you for language, and you're talking something else. I said I didn't follow the language. Why don't you give me the language one more time that you're relying on? Sure. Tell me where you're starting to read. It begins with the word comparison. Comparison? And where is the word comparison? My apologies, Your Honor. You're in little IV? Yes. The calculated volume of your worst-case ‒ You're starting in the middle of IV? Yes. Yes. So the volume, Your Honor, is how big the spill is. But, you know, that's the middle of a sentence. What is the ‒ you have to go back to the beginning of the sentence to be able to understand what the comparison is. Exactly, Your Honor. This is to the size of the spill, the volume of the worst-case discharge. So here, Shell needs to establish what the worst-case discharge is, how big a spill they expect from their drilling activities, and then conduct ‒ or have this ‒ You go back to true. It says reference to your approved OSRP to include. So it has to include this, right? Agreed. Okay. A comparison of the approved worst-case discharge scenario. Okay. You're saying that did not happen? Actually, what Shell compares to is the unapproved plan. The approved plan here was for a 165,000-barrel spill. That's too small. Shell now contemplates a worst-case discharge that's almost 70 percent greater. And so when they conduct this comparison, they're pointing and relying on the unapproved plan. What do you term the unapproved plan? Are you talking about the March 28, 2012, or the March 2010? Or something in between. Your Honor, that's the very point we're making here. We should never have confronted this problem, but Shell was pointing to Plan No. 2. Even Plan No. 2 was not approved. It's the one you've just identified, Plan No. 3, that was ultimately approved. And you're saying that Shell, in Plan No. 3, which was ultimately approved, estimated only 165,000 barrels of oil or hydrocarbons coming out, and they should have estimated 70 percent higher? Let me take you one step back. The approved spill plan, the 2010 plan, was approved to cover a spill of 165,000 barrels. That's 2010. That's the 2010 plan. That was the only approved plan when Shell submitted its exploration plan. We understand that. Please accept the idea that the approval of March 28, 2012 has some meaning in this case. Absolutely, Your Honor. All right. Then what do you claim is wrong with the March 28, 2012 approved plan? It doesn't estimate 165,000. What does it estimate? 480,000 barrels. Isn't that enough? On volume, yes. What's your problem? Petitioners don't make any argument as to the volume of the spill. It's to all the other aspects of how you're going to clean up. The calculation is unchanged. Here, Shell has changed its oil spill trajectories. It has changed its equipment. It has increased the size of its fleet. And it is proposing new techniques that were not before this agency or considered in the exploration plan. Was it considered by the BSEE in the March 28, 2012 decision? Yes. All right. Thank you. And, Your Honors, to be clear, we're not bringing an OPA challenge. This is not a claim challenging the adequacy of the spill plan. These are OCSLA regulations that are intended to govern the review and approval of exploration plans. So if I am understanding your argument, BOEM approved or made their no-harm determination. They said you have the information. They made their no-harm determination. Based not on the 2010 approved plan, but based on an unapproved spill plan that was just proposed as part of the application. Is that correct? Exactly. And then, subsequently, BSEE approved their spill plan, but it was different than the unapproved plan submitted with their application. Is that correct? Exactly. So BSEE still actually submitted to that agency a different plan than the plan that was before this agency. So BOEM made its no-harm determination based, you're suggesting, on the unapproved plan. And then is the approved plan, wouldn't that be more protective so that it wouldn't change BOEM's approval? Your Honors have to be careful. These agencies are doing two different tasks. So BSEE has reviewed the oil spill response plan under the Oil Pollution Act. This agency's harm determination is based on things like the oil spill trajectories, which have changed, which are different today than they were when Shell submitted these plans. So the agency's evaluation of environmental impacts, where this oil is going to travel, in terms of what it could contact once it gets there, are different. The fleet is bigger than this agency had before it when it considered these plans. So, Your Honor, yes, it does matter. And these are important consequences. This isn't nibbling around the edges. To the extent that there was a question, Judge Bea, won't this be a rubber stamp? There's no way of knowing what that's going to do. The fact that the oil is going in a different place, this agency has not even addressed that, and obviously, Your Honors don't have to confront that problem. Well, the BSEE has addressed it. No. BSEE doesn't review exploration plans or specific drilling proposals. But it would determine that their spill response plan was adequate. I mean, they're making a much more detailed technical judgment as to the adequacy of the spill plan to address the worst-case scenario or the probable release that could occur. Isn't that correct? Judge Acuda, it's a very important point. They're looking at a regional plan. They're looking at across the region. What this agency was tasked to do was look at specific wells. Now we know exactly where Shell's going to drill and at what time of the year. So in many ways, this is the more specific inquiry. The BSEE review of the spill plan is when you're drilling anywhere in the Beaufort Sea or anywhere on the Chukchi Sea, here's the spill plan. But now that you're at the specific stage, this agency is tasked with that more detailed, specific review. So that's why 552.19 makes sense. It is the connection between a regional plan and the specific characteristics of these drill sites and where the oil will go and how bad is the ice. Judge Bea asked about the ice. There was a suggestion the ice doesn't show up until November. That runs contrary to the record. By Shell's own admission, the ice in the Beaufort can arrive as early as the second week of October. Ice is a problem in the Arctic Ocean. And to suggest it isn't runs contrary to every statement Shell has made in all of its exploration plans as well as its spill plans. This isn't something the petitioners have invented. This is a challenge. Shell first proposed this technology in May of 2010. It's still not designed. We have no evidence in this record that they've finished it. This is hard, technical, challenging material. Even at the time of the approvals, it was still being designed. Years later, Shell still didn't have its act together. But it will have to be completed by the time they get the drill permit, right? Absolutely. But actually, Your Honor, I'll take you one step back. The agency has conditioned even the exploration plan on the completion of this technology. Petitioners point out that that is an unlawful act in and of itself. Congress created a process by which this agency should review and consider exploration plans, and it gave them three options. And it does not include conditional approval. To the extent that the paragraph 9. My apologies, Your Honor. I didn't hear your question. This is paragraph 9? Yes. That's where they impose the condition for the capping stack. But to be clear here, let's look at the language. When Shell is thinking about or, pardon me, when the agency is thinking about its conditional approval authority, the Chevron, of course, when Congress has spoken to the issue directly, there is no deference out here. But more specifically, in Wilderness Society, the Court has concluded that when Congress has created an enumerated list, it has declared that to be unambiguous statute. Congress didn't give them a fourth option. Here, as the conditional approvals make clear, the agency has recognized Shell's not complying with one of its lease stipulations. Petitioners have explained why it hasn't satisfied various regulatory obligations. So in this instance, the agency has departed both from its own regulatory practice, but more importantly to the agency. Doesn't the regulation allow the agency to approve the permit and then add conditions? Great point, Your Honor. Thank you. If they had cited, if they had complied with the regulations, absolutely. And that is under sub B. That's 233b1. If it satisfies all of the requirements, this goes to Judge Acuda's question and to Chief Judge Kaczynski's. Additional permits that may be required, go get your Clean Air Act permit. Go get your Clean Water Act permit. Congress didn't give them that authority as to Oxla's requirements. These are Oxla's regs. These are the requirements that feed into the no harm determination. That was not to be done on a rolling basis. The expedited review process that Congress created so that we come directly to you suggests the one-stop shopping. You're not going to have rolling challenges to exploration plans every time one of these new conditions is satisfied. Under the agency's interpretation, that's exactly what they've created. Every time one of these conditions is satisfied, there's a new chance to come before you and challenge that activity. That is not what Congress created. Okay, thank you. Okay, so sorry. It was hand-submitted. We'll adjourn. Thank you. All rise. This court for this session stands adjourned.
judges: Kozinski, Bea, Ikuta